United States District Court
Southern District of Texas
**ENTERED**
February 17, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

|  |  |  |
|---|---|---|
| ARMANDO DE LA ROSA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:14-CV-485 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Armando De La Rosa brought this action on December 12, 2014, seeking review of the final decision of the Commissioner of the Social Security Administration that he was not disabled. (D.E. 1). On August 31, 2015, Plaintiff filed a brief in support of his claim. (D.E. 14). On September 29, 2015, Defendant filed a response. (D.E. 15). For the reasons that follow, it is respectfully recommended that the Court **AFFIRM** the Commissioner's determination that Plaintiff was not disabled and Plaintiff's cause of action be **DISMISSED**.

## I.    JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g). This case was referred to the undersigned United States Magistrate Judge for case management and to furnish a recommendation pursuant to 28 U.S.C. 636.[1]

---

[1] *See* Special Order C-2013-01 on file with the District Clerk.

## II.    BACKGROUND

De La Rosa is a 5'2" tall, 51 year old man who previously worked in construction as a laborer except for three years when he was self-employed as a landscaper. (D.E. 12-7, pp. 17-28, 12-8, pp. 3-10, 24-31). He completed 9th grade, but has no additional education or training. (D.E. 12-8, p. 19).

Plaintiff filed a second application for social security disability benefits and an initial application for Supplemental Security Income (SSI) on September 12, 2011, claiming a disability onset date of April 20, 2010, when he was 44 years old.[2] (D.E. 12-7, pp. 2-11).

In 2012, Social Security interviewed Plaintiff who reported that he struggled with his balance which made dressing difficult and he was not able to drive because he was too tired and fatigued.  (D.E. 12-8, pp. 35-38).  A Function Report was completed in May 2012, in which Plaintiff reported that he was homeless, but stayed with friends off and on and sometimes stayed at a shelter. He described his heart condition, chronic pain and bad circulation as preventing him from functioning.  He did not prepare his own meals, but ate at shelters. During that period, he was outside daily. He walked and used public transportation because he had no choice.  He reported that he knew how to handle money, but did not have any and that he went to his doctor's appointments and to community

---

[2] A previous application in which Plaintiff claimed disability beginning August 3, 2006, was initially denied on February 17, 2009, and denied on reconsideration on May 18, 2009. A hearing was held on October 13, 2009. Plaintiff was represented by Homer R. Gonzalez, a non-attorney. The ALJ issued his decision that Plaintiff was not disabled on April 19, 2010. (D.E. 12-3, pp. 77-82). The ALJ found that although Plaintiff could not return to his previous work, he had the residual functional capacity to perform less than the full range of light work, but could perform bench work, work as a cleaner or a  packager. (D.E. 12-3, p. 82). The Appeals Council denied Plaintiff's request for review on August 26, 2011. (D.E. 12-3, pp. 70-13).

centers during the day for shelter. He described his ability to pay attention as short, maybe 5 minutes, and that his physical problems affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, remember, concentrate, and get along with others. (D.E. 12-8, pp. 41-48).

His claims for SSI and disability benefits were initially denied on February 6, 2012. (D.E. 12-6, pp. 4-6). After reconsideration, Plaintiff's claims were denied again on May 4, 2012. (*Id*., pp. 14-18). Plaintiff requested a hearing that was held on April 13, 2013. (D.E. 12-4, pp. 1-28 (Transcript)). During the hearing, two medical experts testified, as well as a vocational expert.

On August 15, 2013, the ALJ issued the following findings that Plaintiff:

1) met insured status through December 12, 2012;
2) has not engaged in substantial gainful employment since April 20, 2010;
3) has severe impairments: obesity, diabetes mellitus, lumbar degenerative disk disease, left plantar fibromatosis, coronary artery disease, arterial hypertension, and hypercholesterolemia;
4) does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;
5) has residual functional capacity to lift and/or carry 10 pounds occasionally and lift and/or carry less than 10 pounds frequently, stand and/or walk 2 hours in an 8 hour day; sit 6 hours in an 8 hour day; occasionally balance, stoop, kneel, crouch, crawl and climb; no climbing of ropes, ladders or scaffolds; no work at unprotected heights or around dangerous moving machinery; and he must use a cane to ambulate;
6) is unable to perform any past relevant work;
7) was a younger individual at the date of alleged onset, 44 years old;
8) has limited education;
9) transferability of job skills is not an issue because past relevant work is unskilled; and
10) there are jobs that exist in significant numbers in the national economy that he can perform. (D.E. 12-3, pp. 3-9).

Plaintiff's alleged disability was based upon back, leg and foot pain, shortness of breath, and inability to walk more than 50 feet, even with a cane. Additionally, he claimed that his legs become numb when sitting, standing, or walking after a period of time. His vision is limited to 20/40 in one eye and 20/200 in the other. (D.E. 12-9, p. 58).

## III.    MEDICAL EVIDENCE

Plaintiff received indigent medical care at his local hospital clinic and its Emergency Department for many years. His medical history before his present disability application included a heart attack in 2002 that resulted in the placement of two stents.

Since 2009, Plaintiff has continued treatment for coronary artery disease. On January 1, 2009, his chest x-ray showed a normal heart, normal great vessels and a normal cardiothoracic ration. (D.E. 12-16, p. 62). He sought treatment at the Christus Spohn Memorial Emergency Department on December 24, 2010, and complained of left leg pain from his heel to his hip that increased while walking and that had been hurting for several months.[3] He characterized his pain as 10/10; the ED physician prescribed Lortab 7.5 mg and took ABI[4] measurements. (D.E. 12-9, pp. 46-54). On examination, Plaintiff's leg pulse on the right was decreased. His blood pressure on that visit was 150/79. He was ordered to follow up with his primary care physician. The diagnostic impression was mild peripheral vascular disease. (*Id.*, p. 51).

---

[3]  The records are inconsistent regarding which leg. One record says left leg, another page reflects right leg pain. *Compare id.*, pp. 48-49 *with* p. 50.

[4]  ABI refers to the Ankle-Brachial Index in which systolic pressure is measured at each wrist and each ankle. Plaintiff's measurements revealed mild obstruction on the right and normal readings on the left. (*Id.*, p. 52).

Plaintiff followed up at the clinic on January 3, 2011. He reported that he could walk about a block. He had been out of his medication for about six months. On examination his right leg pulse was not palpable, and his left pulse was diminished. The doctor diagnosed peripheral vascular disease, ordered labs, refilled the pravastatin,[5] and noted that his blood pressure was well controlled on medication. The physician ordered laboratory tests to see whether patient was diabetic. Plaintiff's weight was reported to be 189 pounds. (D.E. 12-16, p. 36).

In January 2011, Plaintiff had an echocardiogram that revealed a mildly depressed left ventricle systolic function abnormality with an ejection fraction of 45 to 50%. (D.E. 12-16, p. 48). His laboratory results in February 2011 revealed abnormalities in his white blood count and cholesterol readings. His kidney function was also slightly abnormal. His A1C was 6.6.[6]  (D.E. 12-16, p. 52).

On February 1, 2011, Plaintiff went to the clinic to obtain a refill on his Lortab. He was still complaining of back pain and also complained of left foot pain on the ball of his foot that made it hard to walk on the foot. (D.E. 12-10, p. 8). The foot was tender with mild edema. The doctor ordered an x-ray and MRI of Plaintiff's lumbosacral spine, an x-ray of his left foot, and referred Plaintiff to podiatry. (D.E. 12-10, p. 10). His problems were listed as: diabetes mellitus not stated as uncontrolled, pure hypercholesterolemia,

---

[5]  Pravastatin is used together with diet, weight-loss, and exercise to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a692025.html.

[6]  The A1C is a blood test to measure historical glucose levels of a patient for the past two to three months. "For someone who doesn't have diabetes, a normal A1C level is below 5.7 percent. . . . [A]n A1C level of 6.5 percent or higher on two separate occasions indicates you have diabetes. A result between 5.7 and 6.4 percent is considered prediabetes, which indicates a high risk of developing diabetes." http://www.mayoclinic.org/tests-procedures/a1c-test/details/results/rsc-20167939.

mixed hyperlipidemia, htn essential benign, peripheral vascular disease, ankle/foot pain, low back pain, plantar fasciitis, cough, and chest pain. His medications were listed as: Lortab 7.5, metoprolol tartrate 25 mg, pravastatin, nitroglycerine sublingual, cyclobenzaprine 10 mg, and amlodipine 5 mg. Plaintiff's labs revealed borderline high cholesterol, high glucose, kidney damage with mild decrease in glomerular filtration rate (GFR), and an A1C of 6.6, as well as an unconfirmed positive test for cocaine. (D.E. 12-16, pp. 2-6).

Plaintiff visited the clinic again on February 4, 2011, for follow up of his right leg pain; he complained that the pain medication was no help. He described the pain as starting in his calf and working up to his hip. He still could walk about a block. His blood pressure was 122/82. On examination, there was slight tenderness to palpation in his calf. The doctor ordered ultrasound to rule out deep vein thrombosis (DVT), refilled his medication and Plaintiff was ordered to follow up in a week for results. (D.E. 12-16, p. 35). A Doppler Ultrasound performed on Plaintiff's left lower leg February 18, 2011, revealed no evidence of deep vein thrombosis. (D.E. 12-16, p. 14).

Plaintiff had x-rays of his thoracic spine on March 2, 2011 which revealed "no acute traumatic bony injury or significant degenerative changes." (D.E. 12-16, p. 13). Lab results that date revealed some abnormalities. (D.E. 12-16, pp. 46-47).

On March 6, 2011, Plaintiff visited the clinic. His problems were listed as: diabetes mellitus not stated as uncontrolled, pure hypercholesterolemia, mixed hyperlipidemia, htn essential benign, peripheral vascular disease, ankle/foot pain, low back pain, plantar fasciitis, cough, and chest pain. His medications were: Lortab 7.5 mg.

twice a day, sublingual nitroglycerine as needed for chest pain, cyclobenzaprine 10 mg.

every 8 hours,[7] and amlodipine 5 mg daily.[8] Plaintiff's blood pressure was 110/70 and his

weight 178 pounds. Plaintiff was in no acute distress, was ambulating normally, his

cardiovascular exam was normal except for "Apical impulse: not displaced." His pulses

including femoral and pedal were normal throughout. His motor strength and tone were

normal. There was no cyanosis, edema, varicosities, or palpable cord. His extremities

moved normally. His neurological exam revealed cranial nerves to be "grossly intact,"

sensation "grossly intact," reflexes DTRs 2+ bilaterally throughout. (D.E. 12-10, pp. 4-5).

The plan was to add Pravastatin 40 mg daily for his mixed hyperlipidemia, refill his

Lortab 7.5 mg, x-ray and MRI his lumbosacral spine, order an X-ray of his left foot and

refer him to podiatry for his plantar fasciitis. (D.E. 12-10, pp. 4-5). Additionally,

metoprolol tartrate 25 mg[9] was added. The doctor refilled his nitroglycerine, ordered a

lipid panel and an A1C. (D.E. 12-10, p. 6).

On March 9, 2011, Plaintiff was seen in the clinic complaining of congestion and

back pain. He reported that his leg pain was unchanged. His blood pressure was 110/72.

He had decreased pedal pulse bilaterally. His back was tender to palpation at midline.

---

[7]   "Cyclobenzaprine, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

[8]   "Amlodipine is used alone or in combination with other medications to treat high blood pressure and chest pain (angina)." https://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html.

[9]   Metoprolol tartrate is approved to control high blood pressure, treat angina symptoms, and improve survival after a heart attack. http://hypertension.emedtv.com/metoprolol-tartrate/metoprolol-tartrate.html.

The doctor ordered a Doppler for right leg pain. (D.E. 12-16, p. 34). Plaintiff did not keep his March 12, 2011, appointment for test results. (*Id*., p. 37).

Labs reported March 21, 2011, reflect kidney damage with mild decrease in GFR, normal glucose, but with other abnormalities. (D.E. 12-16, pp. 43-45).

On March 22, 2011, Plaintiff underwent an abdominal aortogram and bilateral arteriograms based on his history of right lower limb claudication. When the vasculature was visualized, "diffuse plaque formation" was revealed. The common iliac artery on the left showed stenosis of 50 to 60% and on the right side more than 70 to 80%. Bilateral stenting was performed. (D.E. 12-16, pp. 11-12).

Repeat labs from March 27, 2011 reflected a slight decrease in total cholesterol, a 6.3 A1C, with everything else within normal limits. (D.E. 12-16, pp. 7-11).

On March 31, 2011, Plaintiff visited the clinic complaining of left toe and foot pain; he still had pain in low back and right leg, but less than before. His medications were refilled. (D.E. 12-16, p. 33).

On May 26, 2011, Plaintiff visited the clinic for a follow up on his leg and foot pain. He complained of burning sharp pain in his left foot for the past two weeks that was worse in the morning with first step. He complained of pain 10/10. On examination there was no weakness, no numbness, no redness, no tingling, no swelling, no catching/locking, no ecchymosis, no popping/clicking, no buckling, no instability, no radiation down leg, no drainage, no fever, no chills, no weight loss, no change in bowel or bladder habits. Plaintiff reports back pain, no shortness of breath, no weakness, no numbness, and no dizziness. His blood pressure was 128/80 and he weighed 185 pounds.

His problems were listed as: diabetes mellitus, not stated as uncontrolled, pure hypercholesterolemia, mixed hyperlipidemia, essential hypertension, benign, hypertension, peripheral vascular disease, ankle/foot pain, low back pain, plantar fasciitis, and chest pain, unspecified. His medications were: Lortab 7.5, nitroglycerin sublingual, cilostazol 100 mg, cyclobenzaprine 10 mg, amlodipine 5 mg, enalapril maleate 10 mg, hydrochlorothiazide 25 mg, metoprolol tartrate 25 mg, and pravastatin 40 mg. Plaintiff was ambulating normally had normal strength and tone, normal movement of all extremities, but with tenderness over plantar surface of left foot. His neurologic exam revealed sensation grossly intact. He was instructed in home care for foot, over the counter nonsteroidal anti-inflammatory drugs (OTC-NSAID) and icing. (D.E. 12-16, pp. 28-30).

On June 15, 2011, Plaintiff had a chest x-ray which showed "probable mild congestive failure." (D.E. 12-16, p. 31). He had a normal bilateral lower extremity duplex venous ultrasound on June 12, 2011, with "No evidence of DVT." (*Id*., p. 32).

In July 2011, Plaintiff went to the clinic for medication refills. His leg pain was resolved and he denied other symptoms. His medications included: Lortab 7.5, pravastatin 40 mg, metoprolol tartrate 25 mg, guaifenesin 200 mg, nitroglycerin sublingual, cilostazol 100 mg,[10] cyclobenzaprine 10 mg, amlodipine 5 mg, enalapril maleate 10 mg,[11] hydrochlorothiazide 25 mg.[12] His blood pressure was 110/62 and his

---

[10] "Cilostazol improves the flow of blood through blood vessels. It is used to reduce leg pain caused by poor circulation (intermittent claudication)."
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009616/?report=details.

[11] Enalapril is used alone or in combination with other medications to treat high blood pressure."

weight was 180 pounds. Some of the medications were refilled. His problems were: diabetes mellitus not stated as uncontrolled, pure hypercholesterolemia, mixed hyperlipidemia, essential hypertension, benign, hypertension, peripheral vascular disease, ankle/foot pain, low back pain, plantar fasciitis, and chest pain, unspecified. (D.E. 12-16, pp. 25-27).

In November 2011, Plaintiff visited the clinic for refills on his Lortab and cyclobenzaprine. He also complained of a dry cough with mild shortness of breath. He had pain in his mid-back that was managed with pain medication. He has also had episodic chest pain and shortness of breath that is relieved with nitro treatment. His blood pressure was 139/76 and his weight was 174 pounds. His listed problems were the same as in May 2011 as were his medications, except for the addition of guaifenesin 200 mg. Azithromycin 250 mg was prescribed for his cough and his Lortab was refilled. (D.E. 12-16, pp. 22-24).

On December 18, 2011, Dr. Rene Rodriguez performed a disability examination on Plaintiff for Social Security. Plaintiff complained of pain in both legs while ambulating, pain over his upper lumbar spine that was aggravated by lifting, pulling or carrying objects. He was using a cane to ambulate and taking Norco 7.5 prn for pain. No history of diabetes, thyroid or hyperlipidemia.[13] He appeared to be in no acute distress.

---

https://www.nlm.nih.gov/medlineplus/druginfo/meds/a686022.html.

[12] "Hydrochlorothiazide is a diuretic used to treat high blood pressure and other conditions that require the elimination of excess fluid from the body."
http://www.pdrhealth.com/drugs/hydrochlorothiazide.

[13] Dr. Rodriguez' note is inconsistent with Plaintiff's lengthy history and treatment for high cholesterol as well as with Plaintiff's previous A1C results.

His blood pressure was 129/78. Lungs had markedly decreased sounds with distant expiratory wheezing. His cardiac exam was within normal limits; his musculoskeletal exam showed tenderness on palpation. Plaintiff was not able to walk on heels, toes, squat, hop, or do tandem walking due to leg weakness. His neurological examination was normal, deep tendon reflexes were normal, cranial nerves were normal, and his peripheral vascular examination was also normal. His vision was 20/200 without glasses, right 20/200, left 20/40. The patient was able to sit, stand, move about, and handle small objects. He had mild back pain. His grip strength, ability to handle, finger and feel were normal. No peripheral edema and no congestive heart failure. (D.E. 12-9, pp. 56-61).

On February 1, 2012, Plaintiff visited the Christus clinic complaining of left foot pain on the sole which causes him problems walking on his left foot and he was still having back pain. He was seeking a refill on his Lortab. His weight was 170, blood pressure 140/70. His problem list and medications were the same as previously reported. His left sole was tender to palpation with mild edema, but no erythema. An x-ray of the left foot was ordered and an MRI. Referred to Podiatry for possible injection. (D.E. 12-10, pp. 8-11).

March 5, 2012, Plaintiff visited Christus Clinic for a diabetes follow up. His problem list and medications were the same as previously reported. He had normal strength and tone, no tenderness, normal movement of all extremities, no edema, normal gait; his cranial nerves and sensation were intact and his deep tendon reflexes were 2+ bilaterally throughout. He was referred for a lumbar MRI, to podiatry for plantar fasciitis, and blood work for a lipid panel and A1C was ordered. (D.E. 12-10, pp. 1-8).

On May 2, 2012, De La Rosa visited the Christus emergency department with pain in his left foot. His blood pressure was 130/68, he complained that his pain was 10/10, but he left after triage. (D.E. 12-11, pp. 20-23).

The next day, on May 3, 2012, Plaintiff visited Christus Clinic for follow up with pain in his left foot and back. He has been out of his medication for 2 weeks. His weight was 178, blood pressure 120/80. Patient missed his last three MRI appointments. The doctor took Plaintiff off Lortab, prescribed tramadol for pain and referred him to podiatry. (D.E. 12-16, pp. 67-70). Plaintiff's May 7, 2012, laboratory results revealed an A1C of 6.1, cholesterol 193. The left foot x-ray showed increased soft tissue density in the plantar soft tissues, modest sized plantar calcaneal spur, and minimal enthesophic calcification at the Achilles tendon. The lumbar MRI revealed bilateral spondylosis of L5 without spondylolisthesis, otherwise normal spine, bilateral common iliac vascular stents, no disc herniation, but degeneration with mild disc bulge and component mild annular tear at L5-S1, otherwise unremarkable. (D.E. 12-16, pp. 71-77, D.E. 12-11, p. 15).

On June 15, 2012, Plaintiff visited the clinic for MRI results and requested refills on his tramadol, Neurontin and pravastatin. Plaintiff complains that the tramadol is not working and he needs something stronger. Current medications are tramadol 20 mg twice a day, Neurontin 300 mg 3 times a day, Lortab 7.5 mg twice a day, pravastatin 40 mg once a day, metoprolol tartrate 25 mg, nitroglycerin sublingual, cyclobenzaprine 10 mg every 8 hours, and amlodipine 5 mg. His blood pressure is 140/80 and he weighed 194 pounds. His problems are identified as: Diabetes mellitus, not stated as uncontrolled, pure hypercholestremia, mixed hyperlipidemia, Htn essential benign, peripheral vascular

disease, ankle/foot pain, low back pain, plantar fasciitis, cough, and chest pain. On basic cardio exam, his extremity pulses 2+ and no edema. His back is tender to palpation with pain on extension past 40 degrees. The doctor referred Plaintiff for surgical evaluation since MRI showed stenosis and bulging discs. Medication refilled: Tramadol, Lortab, and Neurontin. (D.E. 12-16, pp 64-67).

On June 22, 2012, Plaintiff went to the Christus emergency department complaining of pain on his left side under his ribs that began that morning. His blood pressure was 153/70, weight 195, and he complained of pain 10/10. His chest x-ray was normal. (D.E. 12-11, pp. 2-7). Laboratory results showed high glucose levels and kidney function with a GFR >60. (D.E. 12-10, pp. 9-10).

On June 29, 2012, Plaintiff was seen at South Texas Brain and Spine for a consult. He complained of mid back pain and leg weakness, chest pains, and weight gain. The low back pain is described as daily aching and sharp which radiates to bilateral hips and worsens with prolonged standing or ambulation. He reported severe calf pain/cramping with ambulation that has somewhat improved after stent placement. Ambulates with cane to improve stability and decrease discomfort. He denied lower extremity numbness, weight 185, blood pressure 167/75. His motor testing 5/5 x4; he ambulates in stooped posture with cautious gait. His Hoffman's and Babinski's signs are negative. He is in no acute distress. Doctor referred Plaintiff to physical therapy for walking program. (D.E. 12-16, pp. 86-91).

On July 17, 2012, De La Rosa went to the Christus Clinic to follow up for low back pain. He had numbness in his entire left leg and bilateral hands. Patient wants

Lortab, but is taking twice the prescribed dose. Blood pressure 144/88, his weight was 191. He is in no acute distress. He has tenderness to palpation over lower back, normal movement and normal strength. He has decreased sensation over left leg and bilateral hands. Discussed pain contract with patient. (D.E. 12-17, pp. 20-24).

On August 4, 2012, Christus laboratory results glucose 278, preliminary positive test for barbiturates and opiates. (D.E. 12-18, pp. 60-65).

On August 15, 2012, Plaintiff visited the Christus emergency department complaining of leg pain, swelling and low back pain. His blood pressure was 131/79. He described the pain as aching, with numbness from his hips to knees that started this morning. His gait was normal. (D.E. 12-18, pp. 47-50).

On August 16, 2012,[14] Plaintiff went to Christus emergency department complaining of cough, fever and chills. Chest x-ray revealed no acute cardiopulmonary disease. He was prescribed tussin, Zithromax and albuterol. (D.E. 12-16, pp. 75-85).

On August 20, 2012, De La Rosa went to Christus clinic to follow up on his back pain. He complains he needs stronger pain medication. He is also there to follow up from the emergency visit for asthma. He has low back pain with pain down his legs and takes Neurontin and hydrocodone, but wants something stronger. He has not gone to PT as ordered by spine doctor. He denies leg swelling, has normal motor strength and movement. Patient signed pain contract. The doctor ordered Doppler for leg pain. (D.E. 12-17, pp. 17-20). The August 24, 2012, Doppler was negative for DVT. (*Id*., p. 26).

---

[14]   The medical evidence at the hearing did not include the August 20, September 24, and December 1, 2012, Christus records and the record is unclear as to when this evidence was obtained by Social Security.

On September 24, 2012, De La Rosa returned to Christus clinic and reported he did physical therapy for two weeks but quit because it was too painful. He signed a pain contract at his last appointment. He is taking two Lortab instead of one. He has normal movement of all extremities. The doctor refilled his tramadol and suggested follow up with the spine doctor in December. (D.E. 12-17, pp. 12-16).

On December 1, 2012, Plaintiff went to the Christus emergency department complaining of chronic low back pain, right leg weakness. He was seeking pain medication. His blood pressure was 151/87. His gait was normal. (D.E. 12-18, pp. 40-45).

On December 28, 2012, Plaintiff followed up at South Texas Brain and Spine. He complained of back pain that goes into both hips and down both legs. His right leg is numb and he continues to have problems walking. He has tried to avoid surgery but can no longer tolerate pain. Activities increase pain. Examination revealed moderate to severe paraspinal muscle spasms and pain to palpation; Gait-unable to walk, antalgic gait, unable to toe walk, stooped posture; and left pinprick sensation is diminished along S1/L5 on both left and right. "This is a 47 year old male with a long history of back pain and bilateral leg pain secondary to mild to moderate degenerative disc disease and disc bulge at L5/S1 and spinal canal stenosis at L3/4. He also has moderate to severe right L5 and S1 sensory motor radiculopathies. We discussed possible surgical intervention but only after he tries a few conservative therapies." The doctor prescribed Robaxin 750 mg and referred Plaintiff for an epidural block. "He may also benefit from facet blocks if the epidural does not help." (D.E. 12-16, pp. 91-98).

In summary, in 2010 Plaintiff sought medical care on December 24 for leg pain in the emergency room. In 2011, he sought treatment eleven times for treatment of back, leg and/or left foot pain. In addition, he was treated for coronary artery disease, shortness of breath, high cholesterol, had iliac stenting to correct stenosis in his leg arteries, was diagnosed with mild congestive heart failure and elevated A1Cs. In 2012, Plaintiff sought treatment 13 times for back, leg and/or left foot pain, although the ALJ did not have the benefit of the Christus clinic and emergency department records for the last four months of 2012. Plaintiff was also treated for possible diabetes, cough, and asthma. He continued with the same medications as in 2011 and in June 2012 was noted to be using a cane, although he also had the cane with him in 2011 for his consultative examination.

## IV.    HEARING TESTIMONY

The medical consultant, Dr. Decherd, who is board certified in internal medicine and urology, testified that: Plaintiff has "multiple exertional difficulties," "a history of myocardial infarction in 2004," two stents were put in, and then "he apparently had some back and chest pain, was hospitalized again with another myocardial infarction." (D.E. 12-4, Page 6). Plaintiff complained of bilateral claudication, worse on the right, he had stenotic lesions in both common iliac arteries, 70% on right and 50% on left, and bilateral stents were placed. (*Id.*). Plaintiff "improved to some extent but apparently still has some claudication upon ambulation." (*Id.*). Plaintiff "has also had back pain and has had an MRI of his lumbar spine which showed degenerative disc disease with mild bulge, L5 and S1 with annular tear, and borderline canal sized at L3 to L5." In June 2012, Plaintiff had complaints of back pain and leg weakness, was using Neurontin, had claudication

used a cane, and discussed surgery but did not want to have it done. (*Id*.). Dr. Decherd noted that during the consultative exam in 2011, Plaintiff was unable to heel/toe walk, squat, or bend at his consultative examination in November 2011, due to back pain. Plaintiff was using a cane and his vision was limited even with glasses to 20/40 on the left and 20/200 on the right. (D.E. 12-4, Page 7).

Dr. Decherd testified that he believed Plaintiff could lift/carry maybe 10 pounds, be on his feet no more than two hours a day, which he would have to break up, sit the remainder of the day, use a cane to ambulate, no climbing of ladders, ropes or scaffolds, no work at unprotected heights or around dangerous moving machinery, and occasional posturals of crawling, stooping, crouching, and kneeling. (*Id*., p. 7). Dr. Decherd acknowledged that he did not receive portions of the medical records, but the psychologist consultant had those records, exhibits 15F-19F, and Dr. Decherd looked at them briefly.[15] (*Id*., pp. 8-9). The medical records available to Dr. Decherd, including those he reviewed briefly, end in August 2012 from Christus, but include the December 28, 2012, visit to South Texas Brain and Spine. (*See* D.E. 12-16, pp. 22-98). Plaintiff's counsel requested that the hearing be rescheduled to allow the witness to review the materials more carefully, but the ALJ denied a continuance. (D.E. 12-4, p. 10).

On cross-examination, Dr. Decherd acknowledged that he did not include Plaintiff's left plantar fibromatosis in Plaintiff's listed ailments, but that problem made no

---

[15] The records not furnished to Dr. Decherd included: his own qualifications, the qualifications of the psychologist David Edwards, Ph.D., Medical records dated March 26, 2009, through June 15, 2012 from thee Christus Spohn Medical Group Academic Center, Emergency Department Records for Christus Spohn of August 6, 2012, and Office records from South Texas Brain and Spine dated May 7, 2012, through December 28, 2012. (D.E. 12-16, pp. 17-98).

difference to his opinion, it was more evidence that walking was painful, but he could not determine how painful from the record. (D.E. 12-4, p. 12). When counsel asked Dr. Decherd about the December 2012 Spine Clinic examination findings that included moderate to severe L5 S1 sensory motor radiculopathy,[16] Dr. Decherd testified that those findings did not change Plaintiff's functional abilities, "I think it's just, just more of the same. He's going to have difficulty ambulating and he can't be on his feet more than two hours a day." (D.E. 12-4, p. 9).

Plaintiff testified at the hearing that he had used a cane for approximately six months because he was getting sharp pains in both legs and his legs get numb when he walks. (D.E. 12-4, p. 15). When he sits his legs get numb too and he has to get up. "I can walk about 100 feet or 50 feet and I've got to stop and wait . . .[ inaudible]." He uses the cane for everything. He lived in a trailer with his daughter; he does not drive. He rides the bus unless his daughter can drive him. (*Id*., pp. 20-21).When his daughter is at work, he sits, "I can't do too much and look at TV and that's about it. And, you know, I walk around, move around. I start to get sharp pain, my leg gets numb." (*Id*., p. 16). When he goes shopping with his daughter, he gets one of those little carts. He doesn't go out much, just to the porch. His leg pains are in both legs, but the left is worse. (*Id*., p. 17). He is not comfortable at all walking. His whole leg and his foot get numb. His back pain goes straight down both legs. (*Id*., p. 18). He was nervous about the proposed back surgery because the prognosis was only 50/50 that he might get better. (*Id*., p. 18). The spine

---

[16] The physical examination revealed that Plaintiff's sensation along S1 and L5 were diminished and his deep tendon reflexes had changed from +2 in previous examinations to +1. The physical examination provided evidence that Plaintiff's complaints of leg pain and numbness had a basis in objective physical findings, his loss of sensation along L5 and S1, as well as the change in his deep tendon reflexes.

doctor suggested that he go to pain management in the form of epidural shots, but he has not gotten a referral and it has been three months. (*Id.*, p. 19). Plaintiff testified that he is short of breath constantly and has chest pains that he controls with nitroglycerine. He also just found out he was diabetic and will find out if they are going to put him on medication at his next doctor's appointment which is scheduled for June 8, 2013. He takes care of his three grandchildren from 3:30 p.m. until his daughter gets home at 6. The children are 9, 8 and 3, but the older children look after the 3 year old. (*Id.*, pp. 21-22). He also testified that his vision is blurry. (*Id.*, p. 23).

The vocational expert, Donna Johnson, testified in response to the ALJ's hypothetical that included all of Dr. Decherd's limitations and a limitation of sedentary unskilled work, that Plaintiff could perform work as a sorter,[17] a scanner,[18] or as a labeler,[19] all of which occupations had over 28,000 jobs in Texas and more than 300,000 jobs in the national economy. (D.E. 12-4, pp. 23-24).

## V.    LEGAL STANDARD

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000); *see also Garth v. Astrue*, 393 Fed. App'x. 196, 198-99 (5th Cir. Aug. 26, 2010) (per curiam) (designated

---

[17] In the Dictionary of Occupational Titles (DOT) 520.687-086.

[18] DOT 249.587-018.

[19] DOT 209.587-010.

unpublished). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Carey,* 230 F.3d at 135; *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The burden has been described as more than a scintilla, but lower than preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Garth*, 393 Fed. App'x. at 198; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted). It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant

cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173–174 (5th Cir. 1995); 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

**VI.    DISCUSSION**

**A.    ALJ'S Determination**

The ALJ found that De La Rosa was unable to perform any past relevant work, that he has limited education, but is able to communicate in English, and that

> he has the residual functional capacity to lift and/or carry 10 pounds occasionally and lift and/or carry less than 10 pounds frequently; stand and/or walk 2 hours in an 8-hour day; sit 6 hours in an 8-hour day; occasionally balancing, stooping, kneeling, crouching, crawling, and climbing; no climbing of ladders, ropes, or scaffolds; no work at unprotected heights or around dangerous moving machinery; the claimant must use a cane to ambulate.

(D.E. 12-3, p. 58). He further found that Plaintiff is not disabled and can perform other jobs in the economy with the expressed limitations. He found that although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; . . . the claimant's statements concerning intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." When assessing the Plaintiff's credibility, the ALJ found his demeanor at the hearing to be poor based upon his brief responses to direct questions and because Plaintiff did not volunteer additional information. Plaintiff took consistent pain medication, but there were gaps in his medical treatment. Plaintiff's testimony was also inconsistent. He testified he sat home all day, but also testified he cared for his grandchildren. He told his physician that he had been

raking leaves and performing chores. Furthermore, Plaintiff did not indicate any problems in his activities of daily living which testimony contradicts his claim that he cannot sit, stand or move about. (D.E. 12-4, p. 8-9).

The ALJ also relied to a lesser degree on medical review of the record for the state agency by Drs. Roberta Hermann and Jeanine Kwun who agreed that Plaintiff could perform a limited range of light work. *Id*., p. 8. In February 2012, Dr. Herman, a medical consultant, performed a records based physical residual functional capacity (RFC) assessment in which she concluded that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for at least 2 hours in an 8 hour day, sit (with normal breaks) for about 6 hours in an 8-hour day, unlimited pushing/pulling, with occasional climbing, balancing, stooping, kneeling, crouching and crawling. Plaintiff had no manipulative limitations, and no visual limitations, although the report noted that his best corrected vision was 20/40, no communicative limitations, and no environmental limitations. The assessment found that Plaintiff's symptoms are partially supported by the evidence and are partially credible. The medical records reviewed by Dr. Hermann included the consultative examination performed by Dr. Rodriguez in 2011, a December 2010 Emergency room visit, June 2011 hospitalization for drug induced rhabdomyolysis, and an August 2011 emergency room visit for a painful shoulder. (D.E. 12-9, pp. 62-69).

In May 2012, Dr. Kwun reconsidered the RFC performed by Dr. Hermann and affirmed it. (D.E. 12-10, p. 50). There is no indication that she reviewed any additional medical information. A Case Analysis was prepared by Lori Spittles in August 2012

which reviewed May and June 2012 x-rays and MRI. The conclusion was that the updated information did not change the previous decision. (D.E. 12-16, p. 16).

### B.    Issues Presented

Plaintiff challenges the ALJ's finding and conclusion on two grounds

1) the ALJ erred by relying on Dr. Decherd's testimony because Dr. Decherd did not mention a number of Plaintiff's well-documented medical conditions, Dr. Decherd had not reviewed portions of Plaintiff's medical record (Exhibits 15F-19F)[20] and he therefore did not consider Plaintiff's treating physician's recommendations from December 2012, and

2) without Dr. Decherd's testimony, the ALJ's finding of residual functional capacity is not supported by substantial evidence. (D.E. 14, pp. 4-11).

The Commissioner responded that it is the ALJ's sole responsibility to determine residual functional capacity and such a determination should be based on all of the relevant evidence, not just on the medical expert's testimony. (D.E. 15, p. 4).

### C.    Analysis

The ALJ has the sole responsibility to determine a claimant's disability status. *Jones v. Colvin*, --- Fed. App'x. ---, 2016 WL 158016 at *4 (5th Cir. Jan 13, 2016) (per curiam) (designated unpublished); *Martinez v. Chater*, 64 F.3d 172, 176.(5th Cir. 1995) (per curiam). He or she is required to consider the "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work" to determine residual functional capacity. *Bayer v. Colvin*, 557 Fed. App'x. 280, 288 (5th Cir. Feb. 12, 2014) (per curiam) (designated unpublished)(citing *Hollis v. Bowen*, 837 F.2d 1378, 1386-87). In determining disability,

---

[20] Exhibits C15F though C19F are contained in the Court's docket entries at D.E. 12-16, p. 17 through 98. Exhibits C15F and C16F do not appear to be at issue because they are the medical experts' resumes.

the ALJ must accord considerable weight to the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses. *Butler v. Barnhart*, 99 Fed. App'x. 559 (5th Cir. June 2, 2004) (per curiam) (designated unpublished); *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000). "An ALJ may not reject a medical opinion without explanation and must show good cause for doing so." *Butler*, 99 Fed. App'x. at 559; *see also Loza*, 219 F.3d at 395; *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001). "The opinion of a specialist generally is accorded greater weight than that of a non-specialist." *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).

Plaintiff relies on *Bridges v. Comm'r of Soc. Sec. Admin.*, 278 F. Supp. 2d 797 (N.D. Tex. 2003).   (D.E. 14, pp. 6-7).   In *Bridges*, the District Court reversed and remanded for further administrative proceedings where the ALJ relied on incomplete testimony of the medical expert.   There, the medical expert had only considered three of the Plaintiff's five severe impairments.   The medical expert concluded there was no evidence that the Plaintiff's heart condition would affect the Plaintiff's residual functioning capacity.   However, upon review, the omitted evidence consisted of records documenting the Plaintiff's heart condition over a two year period.   The District Court in *Bridges* determined remand was required because it was unclear whether the ME had considered the evidence of Plaintiff's heart impairment.

The facts of the present case are distinguishable from *Bridges* because in the instant case the medical expert reviewed and considered the evidence prior to testifying. The testimony at the hearing establishes that Dr. Decherd received a disc containing

medical records that did not contain hearing exhibits 15F through 19F.  (D.E. 12-4, p. 9).
All of the exhibits (C1A through C19F) were all admitted into evidence and made part of
the record.  (D.E. 12-4, p. 5).  Dr. Decherd spent 20-30 minutes reviewing exhibits 15F-
19F prior to testifying on the day of the hearing.  (D.E. 12-4, pp. 9-10).   Further, Dr.
Decherd had the exhibits in front of him when testifying and he was asked specific
questions about those exhibits.  (D.E. 12-4, p. 10).   The ALJ denied Plaintiff's request
for a continuance because he was satisfied Dr. Decherd had reviewed and considered the
exhibits and Dr. Decherd was subject to examination on all of the exhibits.  (D.E. 21-4, p.
10).

The record in the present case is also distinguishable from *Bridges* because
substantial evidence supports the ALJ's decision.  "[A]n ALJ's reliance on the inaccurate
or incomplete testimony of an ME is reversible error unless other substantial evidence
supports the ALJ's decision."  *Bridges* at 804-805 *citing Carey v. Apfel,* 230 F.3d 131,
142 (5th Cir.2000).   Although Dr. Decherd did not have a copy of Plaintiff's complete
medical record until the day of the hearing, he testified that the December 2012
examination did not change his view of Plaintiff's abilities—Plaintiff had limited ability
to walk which was reflected in his testimony that he would need to work indoors and his
walking be sporadic rather than all at once. (D.E. 12-4, p. 9).  Plaintiff argues the omitted
records include evidence Plaintiff suffered from diabetes mellitus, coronary artery
disease, arterial hypertension, and hypercholesterolemia (high cholesterol) ( D.E. 14, p.
5).  However, these impairments are not inherently disabling. *See Kraemer v. Sullivan*,

885 F.2d 206, 208 (5th Cir. 1989) (obstructive pulmonary disease, hypertension, and low back pain not inherently disabling under the Act).

The ALJ is charged with reviewing all of the evidence, weighing it, and as fact-finder, he is also charged with determining the credibility of the witnesses. "The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ, who has had an opportunity to observe whether the person seems to be disabled." *Nugent v. Astrue*, 278 Fed. App'x. 423, 427 (5th Cir. May 16, 2008) (per curiam) (designated unpublished) (quoting *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983)). As such, these determinations are entitled considerable deference. *Id.* (*citing Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987)). Although there is objective medical evidence confirming Plaintiff's coronary artery disease that could account for his feelings of being out of breath and his fatigue, evidence of degenerative problems in his low back, and evidence of plantar fibromatosis, the objective evidence does not establish that Plaintiff's complained of chronic pain is "constant, unremitting, and wholly unresponsive to therapeutic treatment" as required to constitute a disability. The ALJ recognized Plaintiff's ambulatory limitations by finding that he could work at a job that required only limited walking.

Although the omission of some medical information from the medical expert's packet was not ideal, Dr. Decherd considered all of the available medical information and addressed it in his testimony. The ALJ did not err in relying on his testimony. On this record, the ALJ's determination of Plaintiff's residual functional capacity is supported by substantial evidence.

## RECOMMENDATION

It is respectfully recommended that the Commissioner's determination that Plaintiff was not disabled be **AFFIRMED**, and Plaintiff's cause of action be **DISMISSED**.

Respectfully submitted this 16th day of February, 2016.

_____
Jason B. Libby
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).